Court. My name is David George and I represent Gilbert Sanchez. The Supreme Court has held that the purpose of the Jones Act semen test is to separate semen from land-based workers who happen to be working on a vessel at a given time. People are not semen when their presence on a vessel is transitory or sporadic. Sanchez worked and spent over 90 percent of the time he worked for Smart Fabricators working on vessels in navigation. He was injured while in the Gulf of Mexico on a vessel in navigation. This court semen test is consistent with Supreme Court case law and as the panel recognized, Sanchez is a semen under this court's test. Because Sanchez is a semen, this case was not removable. This court therefore should reverse the district court and remand this case back to Texas State Court. To be a semen, a person must meet a two-part test. First, they must contribute to the function of the vessel and the accomplishment of the mission. And there's no dispute here that that was met. The Smart Fabricators agrees that was met. And next, the person must have a connection to a vessel in navigation that is substantial in terms of both duration and nature. And Mr. Sanchez had that during his time with Smart Fabricators. George. Yes, your honor. Let me ask you, how do you say that he satisfied the nature test and spent 30 percent of his time, employment time, with Smart Fab doing semen work? And I ask you to consider the work he did on the 350 because I assume you agree that we've got to consider the work he did on the 350 because the work he did on the other Enterprise vessel, the 263, only comprised less than 20 percent of his time. Do you agree? Well, we can see, yes, both the two vessels, the WFD 350, the vessel he worked on in Sabine Pass, and then the Enterprise 263, the vessel he was working on when he was injured, which was in the Gulf of Mexico, both would be. But under this court's test and your honor's opinion in Nochlin, he would qualify as your held in the panel opinion. I think the question there is, is this court's test that it used in Nochlin and in Endeavor Marine, is it somehow inconsistent with the Supreme Court test? Because in the concurrence suggesting the case go en banc, your honor suggested that the harbor tug versus papaya case added a condition that a worker must actually go to sea. And because the vessel in Sabine Pass was jacked up next to the dock during the time he was working there, he did not go in a literal sense to sea. But I believe as the court recognized in Nochlin and in Endeavor, the papaya court, the Supreme Court of papaya did not change the test from Chandra's. In the Chandra's test, the, you know, the Supreme Court in papaya made clear, they said, our recent cases explain the proper inquiry to determine seaman status. And then the court said later in papaya, you know, that this is the holding in Chandra's and we adhere to it here. So the Supreme Court's message in papaya was not that they are enunciating a new test with a new factor of a literalistic going to sea. Instead, what they were using as this court said in Endeavor Marine, that it when read in context, the going to sea language in harbor tug versus papaya is a shorthand way of, you know, of saying that the Chandra's test and this court said that the Endeavor, they didn't think that the harbor tug versus papaya intended to articulate a new test. Instead, as this court said, it read harbor tug versus papaya to merely restate the point it had made in Chandra's. And I think subsequent Supreme Court cases support that. Let me ask you to comment on the papaya case. Yes. The facts there are very analogous to ours. The court said that the job he was hired to do was to paint a tug. And I think it was a one day job. And they said that he had no plan to sail aboard the tug after it was finished. Looking for the quote, this is not a case where the employee was hired to perform seagoing work during the employment in question. And then they added, papaya testified in his deposition that he worked aboard the point bearer, which was one he was paying on three or four occasions before the day he was injured. The most recent of which was more than a week earlier. Each of these engagements involved only maintenance work while the tug was docked. The nature of papaya's connection to the point bearer was no more substantial for seaman status purposes by virtue of these engagements than the one during which he was injured. Now, why was the maintenance work that Sanchez was doing different from the work that the court's talking about in papaya? Well, I think when looking at the question is, is this person, you know, a member of the crew? Now, to be a member of the crew, you don't have to actually be employed by the vessel owner. You can work for a shore based entity. Supreme Court made that clear. And he went there for one day, and it was a day job, and he was gone. There was no sort of allegiance to it. And mainly, he worked out of a hiring hall. And a lot of the case dealt with whether you could consider the hiring hall as one fleet or whether you had to look at the vessel in itself. And the Supreme Court said you could not consider that. But here, we have the enterprise, the smart fabricators has Mr. Sanchez working there for 40 something days. He's there every day. It's his full time job there. All his work is there. And then he goes to sea, in a literalistic sense, with the other vessel, where he's actually, you know, it's sailing, and then it's out in the Gulf of Mexico. And so we consider all those together. But in papaya, it was just a, the question is, did he have an allegiance to a vessel in a real sense? Well, I can ask you the same question about Mr. Sanchez. I mean, he was employed by Smart Fab. He wasn't, he didn't sign on to the vessel for enterprise. He had a one-shot job, and that was welding the deck. So why would you, how could he be considered to have allegiance to the vessel? Well, you do not have to actually work for the vessel owner to have an allegiance to the vessel. In the Ghizoni case, the Supreme Court made clear that even workers who are employed by a shipyard, so not the vessel owner, but a shipyard, can qualify as a vessel crewman. So he is there for, you know, 45 days, day in, day out, all of his workday is spent there. That is allegiance to a vessel, very different than the allegiance one would see for a one-time thing. And then it's also important, I think, to look at the Supreme Court's post-Papai case. That's the Dutra construction case. And there, the court made clear that the, you know, brown water sailors, even those who are, like, on a dredge, which, you know, dredges, when they operate, are actually very similar to being jacked up. They're sputted up or sputted down, connected to the ground. And the Supreme Court said, it seems a stretch of imagination to clasp the deckhands of a mud dredge in the quiet waters of the Potomac Creek with the bold and skillful mariners who breast the angry waves of the Atlantic, the end of the quote. But the court said they are seamen, and the court found in Dutra that the man was a seaman. And that case, I think, is very similar. It was a dredge involved in the Boston, the Big Dig, where they were building that huge tunnel, and that vessel was a huge dredging vessel, and it would move maybe a few feet, but not even with its own engine. I think it generally just kind of moved with its anchors. But it was a vessel that was just set there, and the man could go home. Your Honor, I believe in the concurrence, and in this case, at the panel level, made the point that Mr. Sanchez could take two steps off the vessel and be on land, and therefore he was not, you know, exposed to certain perils that other people would be. Well, that's the same thing that we would see in the Dutra case, where the man who's working in the middle of Boston on a dredge ship comes and goes. In fact, almost all dredge workers on rivers go home or go on land at the end of the day. Very few of them sleep on a vessel, and in addition, if we look at Chandris itself, where Chandris was an engineer with the shipping entity, and one of the main questions there was that vessel was put in dry dock at one point, and the question was, can the time the vessel is actually in dry dock, not even in the water, be considered when determining whether the person is a seaman? And the Supreme Court said, yes, absolutely, that case must be considered. In fact, reversed the district court's jury instruction to not consider it, because it's important to know. Mr. George, I appreciate this. I mean, I think this history about the cases is very important, but Chandris points, I think that something in Chandris or one of the opinions commenting on Chandris, the man was basically an engineer who supervised engineering. This brings up Endeavor Marine in a way, and he occasionally went on a voyage with the vessel, and in fact, it was on the particular voyage that he had his detached retina. Whether the vessel was in dry dock or in navigation really isn't the point, because to me, the point is, did he have a substantial connection with the vessels? And that is to say, the vessels in cases, Gazzone, Stewart, Chandris, Popeye, in terms of whether the people were pursuing their profession in connection with vessels in navigation. And there's a good argument that they didn't follow the Naquan and the Endeavor Marine cases. Well, Your Honor, I believe that the question, you're exactly right. The question is, were they working on a vessel in navigation? Now, a jackup rig is a vessel. There's no question. Supreme Court, especially in Dutcher, goes into this. It's an extremely broad category. As long as it's a water craft that can be used as a transport, it's a vessel. In addition, the vessel was in navigation. The Supreme Court has made clear in Chandris as well as in Dutcher that navigation does not mean sailing. A ship that is docked, a vessel that's jacked up, is in navigation. In fact, in Chandris, the Supreme Court made clear a vessel in dry dock is in navigation. But Chandris wouldn't have gotten to the Supreme Court, it seems to me, but for the fact that he went on the voyage to Bermuda and then sailed with the ship from Bermuda to Germany. Well, I think it's both, Your Honor, because they wanted to consider how much of his time was vessel in navigation. And the time when the ship was actually in dry dock is vessel in navigation time. It was how much of his overall work. No, it was asking whether it was a vessel in navigation. When you read that, the Supreme Court has taken... But we look at the overall work. Well, yes, if we look at the... Well, I think the key point trying to make is that the vessel... There was never a time when either of these rigs were not considered vessels in navigation under the Supreme Court test, because regardless of whether they're docked or not docked, they're in navigation. Now, the question, much like Mr. Chandris, who was injured on a voyage, Mr. Sanchez was also. Mr. Sanchez was not injured on the WFD during his time in Sabine Pass. Instead, he was injured in the middle of the Gulf of Mexico, where he had been sailing there. And then he was doing work... And we talked about getting the vessel ready. This is a special purpose vessel that's going to drill for oil and gas. And he was doing the welding and the preparing the vessel so that it could do its function. And there's no indication that he was... He was injured on the 8th, and then the work was finished on the 10th, and the vessel began drilling on the 11th. There's nothing in the record to indicate that he wasn't going to be staying that whole time. You know, much like a ship's carpenter is a member of a crew in the old days of the... of sail, a welder is a very needed person on a all-metal drilling rig. And an accountant is a very needed person on how the ships run when they're running. But the fact that the accountant may go on board to view the documents on the ship and occasionally ride with the ship maybe to one port, so in order to see exactly to audit what's purchased, doesn't mean that the accountant is a seaman, does it? Well, Your Honor, if that accountant worked only... virtually only on vessels and between land-based people who have a sporadic time on vessels and navigation, and those who work there basically full-time. Mr. Sanchez spent two days with smart fabricators, less than three percent of his time there, ever on shore. He worked solely, virtually solely, on vessels and navigation. Now, those vessels, you know, may have been docked at times, but they... but the Supreme Court also made clear that workers and vessels, you know, workers do not oscillate in and out of seaman status, nor does a vessel off... oscillate in and out of navigation status or in and out of vessel status. So a vessel, be it floating, docked, jacked up, is a vessel in navigation as long as it's not taken out for major repairs, which obviously was not involved here, and then when it was in the Gulf of Mexico, obviously, it was a vessel in navigation. So we have... Mr. George? Yes. I have two sort of very thinly sliced questions. One is, if we do conclude that our Naquin decision wrongly applied Chandra's, does that necessarily mean that Endeavor Marine was wrongly decided as well? That's one question, and the other question is, Apelli and Amici extensively rely on scholarship that is critical of our alleged over-application of Chandra's in Naquin. I think, as I read it, they re-urge a focus more towards going to sea. Because maritime law scholars are so engaged with our decisional law, my question to you is, do you know of any scholarship that actually defends Naquin and Endeavor Marine? As to the second part in our brief, we do discuss and mention various articles that do discuss the test. I think we bring that up at pages... Well, my specific question was whether they endorse Naquin, and the Admiralty treatise, Showerbomb, if I'm pronouncing it correctly, seems to. So it's concerning to me whether or not Naquin has caused disruption in the case law and scholars defend it or not. But if you put it in the briefs, I didn't notice it. I'll look at it. On page 31, we mentioned that some of the commentators are worried that getting away from a Naquin to follow a strict at sea would shut out a large number of groundwater seamen who fall under the Jones Act. So on page 31 of our en banc brief. Now, as to the first question, if Naquin goes, does that mean Endeavor Marine goes? And I would point to Judge Jones's dissent in Naquin. And there, she made the point that the court could be totally consistent to Endeavor Marine and still rule against Mr. Naquin. So while in this case, the concurrence said they wanted to reconsider both Endeavor and Naquin, and when Naquin was decided, I believe in 15, Judge Jones made a strong argument that that Naquin was not, that Endeavor and Naquin were different situations, and Endeavor Marine did not have to be set aside, I believe. Mr. George, Mr. George, any port in a storm? Mr. George? Yes. I want you to clarify one thing for me. You talked about Mr. Sanchez working on a number of vessels over an extended period of time. The only vessels that count are the enterprise vessels he worked on while he was working for SmartFab as far as substantial connection. Isn't that true? Yes. Well, that's virtually all his time. Of his time with SmartFab, he spent 91% of it, I believe, working for the enterprise vessels, two vessels, and he spent two days on land, and then he spent, I think, four days on an Insco-owned vessel in the Gulf. So yes, we'd only consider those days with the Endeavor, but that is virtually all of his time. Okay, focus on the work he did on the 350. How can you say that welding while the boat is docked is doing the ship's work in the traditional sense, or that his duties took him to sea, or the quote in papaya that this was not doing the maintenance work, either on painting the boat or the other maintenance work, was not seagoing work that would help him show the durational prong? Well, I think we're making a difference between durational prong and substantial in nature. The one day, definitely, papaya, that was mainly his problem, I think, is he had a one day, whereas here we had, I think, was 45. Now, the Supreme Court has held that shipyard, that repairing a vessel is the ship's work. That's a standard thing that crew members have often done, and the Supreme Court recognized that. So this is a special purpose vessel getting ready to go to sea, and it doesn't take passenger, it drills for oil and gas, and he was doing the work in getting the vessel ready, refitting it, so it would be ready to drill. So that is the ship's work as much as anything, just as a, you know, a carpenter on a ship and one of the old wooden sailing vessels plugging a leak would be doing the ship's work. Now, as to whether he was exposed to the perils of the sea, I think your Honor's decision in Nakhwen addressed that and pointed out that sailors, or that seamen and people on vessels, even the brown water ones, have still exposure to risks, and those risks can include, I mean, and this was not even a brown water, this is Sabine Pass, which is where the Sabine River in the Gulf of Mexico meets, so he's basically at the mouth of the Gulf, and there there's dangers of of elisions from other vessels, there's the danger of misstep puts one in the water where one could drown, there's the dangers of storms at sea, especially when the vessel's out in the middle of the Gulf. Mr. George, don't you need to clarify your argument about shipbuilding and repairing? Those professions are included within the agreement. Well, it does matter because, as you started your argument, Congress created a distinction between coverage for longshoremen and coverage for seamen, and the Supreme Court, the whole point of Wielander and Chandra's was that the Supreme Court had been overruled several times by Congress when it was blurring those distinctions, and they were trying to redraw the distinction in a way that made sense while also acknowledging that in a few instances someone who does ship repairs is exposed to the perils of the sea. The Supreme Court said in has a job trade that is actually a listed job trade under the LHWCA does not mean they can't be a seaman. But they would have had no reason to bring up those cases if the law pre-existing Wielander had not gone contrary to for 33 years or more, blurred the distinctions. Well, that's in the early 90s. The Chandra's, the Gazzone, those were later, but they made clear that while Jones Act seamen and LHWCA are mutually exclusive, but what they held is if you qualify as a Jones Act seaman, you don't go under the LHWCA, but it doesn't mean that if you're listed as a LHWCA craft that you cannot be a seaman. The Supreme Court made that clear. Mr. George, your time has expired. You've saved some time for rebuttal. Would you add a minute to Mr. Jett's time, please? Thank you, Mr. Jett. May it please the court. Matt Jett for Appelli Smart Fabricators, LLC. Mr. Sanchez is not a Jones Act seaman. He's a land-based welder. He spent over 70 percent of his time working on a and docked on shore. Every judge that's looked at this situation has determined he's not a Jones Act seaman. So why are we here? What's the problem? The problem aren't the facts. Those are undisputed. The problem are the Endeavor Marine and Nopkin decisions. So how do we fix this problem? What do we do? I'm going to discuss three things with you today. First, I'm going to discuss Endeavor Marine and Nopkin and their findings. Second, I'm going to discuss Supreme Court precedent regarding substantial connection and nature tests, how Nopkin and Endeavor strayed from that, and how it led to us being here today. And the third thing I'm going to discuss with you is how we fix it. Now, you may remember Endeavor Marine involved a crane barge operator who only worked on the while it was moored or being in the process of being moored. He never traveled with the vessel at any time. The court in that case found he was a Jones Act seaman because he was exposed to perils of the sea while working on the Mississippi River. Subsequently, we had Nopkin, a vessel repair supervisor who worked in a shipyard on a canal. 70% of his work as his vessel repair supervisor consisted of looking at vessels that were docked, moored, or jacked up out of the water. He never traveled with those vessels on their missions. In that case, the Fifth Circuit found he was a Jones Act seaman because the work he did was on a my second point. What does the Supreme Court precedent say about the substantial connection and nature requirement? Well, we know from Willander that the purpose of the substantial connection both in duration, which is the quantity of work, and connection, which is the quality of the work, is to separate those who have an allegiance to a vessel as compared to those who only have an allegiance to their land-based employer. And the first time the Supreme Court really expanded on the substantial in nature requirement was at Chanders. And we know from Chanders the Supreme Court stated, you don't just look at where the person was injured, you look at the totality of the circumstances on the vessels in question. And the ultimate inquiry you make is whether this was a member of the vessel, a crew member of the vessel, or a land-based worker who happened to be on a vessel at the time of their injury. You look and see if that worker traveled with the vessel when it accomplished its missions. Chanders went even as far to state it's not exposure to perils of the sea that determines seaman status. It requires more than that. That is not the determining factor. Next we had Papey. In that case, the Supreme Court dug deeper into the substantial in nature requirement. The court found that a worker who only worked on a vessel that was docked was not engaged in seagoing activity, their duties did not take them to sea, they did not travel with the vessel, and they were therefore not a Jones accident. So why are we here today? Well, what has happened is it appears that Endeavor Marine is knocking it straight from this precedent. They have decided to latch on to exposure of perils of the sea rather than focusing on whether the employee's duties take them to sea and they travel with the vessel with the vessels doing its work. And as a result, we're in a situation like we are here today where we have a gentleman who spent 72% of his time working on a jackup rig that was jacked up out of the water and docked on shore. 48 of the 61 days he worked on Enterprise vessels, he took two steps off a dock onto a jacked up and docked vessel. He worked, he took two steps off of it, he went home, he had dinner with his family, he brushed his teeth, and he went to bed. The other 13 days he worked for Enterprise, it was on the 263. Now I will readily admit that at the time of his injury, he was welding, and the jackup rig was on the outer continental shelf, and it was jacked up. That was nine days of his work. Nine days of the 19%. At that time he was welding, the vessel was not engaged in the vessel's work, the vessel was not drilling. The other four days, he was merely a passenger traveling to the outer continental shelf. While he was a passenger, he did no work. He didn't assist the vessel with its mission, he didn't work alongside the crew, and he was never a crew member of either of these vessels. That's the problem. We have a gentleman who's not a Jones-Zack Seaman, but because of the decisions and Devon-Marina knocking, the court is constrained as a result of improperly focused on Perils of the Sea to find him to be a Jones-Zack Seaman. So, so how do we fix this? The court should follow Supreme Court precedent, and the court should refine its Seaman status test in line with that, and it should require to satisfy the substantial in nature requirement that the employee's duties take them to sea, and they do the work of the vessel on its missions. That means people that work dockside on vessels that are jacked up and docked and moored and don't go out to sea would not be Jones-Zack Seaman, and that's okay. Let me ask you about that distinction, Mr. Jack, and yet there may be a distinction between Knockland and Endeavor Marine. Among the tests that have been suggested to us, and some of the scholarly writings have been referred to us, including by one of our amici, Mr. Angeron, on, he talks about the need that the work, or the person, the worker, be both peripatetic and migratory. Migratory sounds to me like actually a voyage of some kind, but if you look at the facts of Endeavor Marine, that derrick barge actually did move. It moved in brown water, but it was moving, whereas in Knockland, I may have it backwards, the derrick barge was moored. What are we looking for in your view of what going to sea? We know it doesn't literally mean going to sea. You have to get out in the Gulf before you're a Jones-Zack Seaman. We have some cases on ferries down off of Canal Street and going over to Gretna or Algiers or wherever, and I imagine those are seamen. I don't know if you're arguing to the contrary, so you don't have to go very far. How do you see what we're really requiring for some analog of going to sea? Well, I would point out that the first item you mentioned, you're correct on the facts, Endeavor Marine did involve the crane barge operator, but I think it's important that those vessels did move via tug, but he was actually not working on the vessel other than when it was moored or being in the process of moored, so he was not actually working. Regardless of the facts of those case, I'm really asking you a more basic question. Are you saying there's sort of a quantum of movement that is required before someone has gone to sea in a river situation or in something other than actually going out to the Gulf? I think based on the case law that I've seen, it requires the employee to be doing the vessel's work at the time and not docked. Does that mean it has to be in the sea? I don't agree with that. I think it's anyone working in brown water, for example, what you asked about earlier regarding the ferry worker, he would obviously be a member of the crew and he would be traveling with the vessel while it does its work. You would have to look at the totality of circumstances. I'm not suggesting there's a bright line number that you have to meet regarding the amount of work you do, but I think based on the fact that they were traveling the requirement. Keep going. Regarding the ferry member, in my understanding, those are generally always crew members, so they would not be subjected to this test as compared to the situation we have here, which is a land-based employee who works for a land-based company, who's working on a vessel subject to his assignment by his land-based employer. Now going. Mr. Jett, are you familiar with our case, Grob versus Bow Brothers? I am, your honor. What's your opinion about that in view of your test? Let me find my notes on that. Those are the fellows who eluded with a stand-up, something or other, in Lake Pontchartrain while they were going to and from a crane barge and That's correct, your honor. That was one of the cases that the decision and knock and relied upon, if I recall correctly. And in that case, they were actually traveling with the vessel and were exposed to perils of the sea inherently as part of that work. And if I recall correctly, they were crew members of the drilling crew, which we know under Robinson would be included as Jones X Steeman. And they were also injured, and I know we don't only focus on the injury, but they were maritime injury as compared to here, where we had a gentleman that tripped on a piece of pipe, which is more akin to a longshoreman's type of injury. I mean, don't you think it's fair to say the Supreme Court has been trying to draw a reasonable distinction between the Jones Act and the Longshore Act? They believe that certain people who do work that might otherwise be covered by the Longshore Act may in fact bleed over or be Siemens work. But there's a little question the neck knock when would have had compensation under the Longshore Act, right? That's correct, your honor. And in fact, that's what occurred in this case is Mr. Sanchez received longshore benefits until he was found to make maximum medical improvement. And those ought to be the exception rather than the rule in regard to people who work basically dockside, don't you think? That's correct. And Congress and congressional intent has shown this is the way they want the courts to go. Every time the court has improperly included these dockside type workers, Congress has responded to that and overturned those decisions. And obviously the judges and the court's job is to try to read in the tea leaves and go with that intent. And that's why it's clear that these workers were not intended to be beneficiaries of the Jones Act because the type of work they are doing is not Jones Act work. Do you have any opinion on the on the test that Mr. Angeron proposed or does your test differ from that one? My test is very similar to Mr. Angeron's test. He's a very learned scholar and he knows this stuff far better than most people in the United States, I believe. And his test is very much encapsulates what our test is. The one thing I will say that ours is somewhat different is that I still think you do have to see. I don't think you completely cross that off the list. I think that's going to be a factor no matter what. But I do think you need the employee to be going to see by engaging in seagoing duties that involve the work of the vessel while it's operating. Assuming arguendo that we were to modify our test, what results then in this case? And what do we what what happens in this case? If you were to modify your test and not be constrained by the exposure to the perils of the sea as the determining factor of seaman status, you would find that Judge Rosenthal and all the other panels that have looked at this case have found he's not a Jones Act seaman were correct and rules a matter of law. He's not a Jones Act seaman. This would result in his case being dismissed as a matter of law. However, he has received compensation under the Longshore Harbor Worker Compensation Act. So there would not be an occasion to remand if there was not a fraudulent situation? If the court finds he's a Jones Act seaman, then the case would need to be remanded. I would state that none of the facts are in dispute. So this is a decision that the court can make. There are no factual issues. The court is able to make its decision based on what we have before us today. And in regarding that, I would point out in response to Appellant's argument that there's nothing in the record indicating that Mr. Sanchez was not going to travel to 263 after he finished his work. Likewise, there is nothing in the record establishing he was going to OIM and the owner of the Enterprise vessels that stated he was not a crew member and he did not assist the vessel in any navigation. Mr. Jett, my difficulty, especially with the Supreme Court, this has been presented to our court and the Supreme Court trying to define something Congress didn't. My concern is not so much that we modify the test, but that perhaps we correct one, maybe two circuit decisions that went beyond the Supreme Court totality test. In other words, I'm a little reluctant to say that a professor's suggestion that we have, call it a quantum of movement test, that seems to make an overcorrection in the same way that maybe in Naquin we highlighted perils of the sea too far. So to turn this into a question to you, I was very grateful in your brief at pages 18 to 20, where you emphasized the circuit decisions that you wouldn't disturb. Now, my question to you is besides Naquin and maybe Endeavor Marine, can you point to any circuit decision or district decision that you think was wrongly decided? The only one in part of it's because I do not have all the facts because they're not in the district. I do not have all the facts because they're not in the district. They say he traveled on vessels for 75% of his time, but I'm not sure if he was the same situation as here as Mr. Sanchez, or if he actually in fact traveled and worked on those vessels while they were in operation. And that's mainly because of a factual dispute. I will point out the majority of the cases outside this district have found that similar employees are not Jones Act seamen because they do not have a substantial connection in nature to the vessels in question. Two other quick questions. One is, can you speak to Dutra? Yes. And then the other question is, would you agree if this, if Mr. Sanchez had spent, if we play the percentages and he'd spent 70% of his time, 20 miles offshore on rig 263, then he would qualify. Regarding Dutra, I think it's very important to point out that the issue in Dutra was whether or not that dredge was a vessel. The issue in that case did not concern whether or not the employee was a Jones Act seaman or had a substantial connection in nature to the vessel. That was not the focus of that case. That case was mainly, if not almost wholly concerned with whether or not the dredge was a vessel. So that's my response to Dutra. Regarding if the facts were changed, I mean, we understand that under Chandler's, we look at the totality and we don't just look at the snapshot and that's what we're confined to here. But taking the hypothetical into question, I would not completely concede he was a Jones Act seaman if he worked on the 263 for 70% of the time. And the reason why is all the work he did on 263 was while the vessel was not in operation, it was jacked up out of the water and he was doing maintenance type work. He was not assisting the vessel with its mission and he was not working alongside the crew. That's a little more difficult for me to accept, but I don't speak for my colleagues. That man seems to have gone way far to sea and he is very exposed. And I say this with respect to the first panel in this case, I don't think just because you're jacked up high on a rig, you're not at perils to the sea. So looking at the metaphorical language the Supreme Court seems to have given us, gone to sea, perils of sea, even allegiance, I would have said that that hypothetical would say this is a Jones Act seaman. But I respect, I don't, you know, that's a hypothetical and you've answered it very well. I'll think about it. Mr. George, I'm sorry, Mr. Jett. In view of the fact that anytime you're on a boat in the water, you're subjected to some perils of the sea. So why is that really a helpful criteria, except for the fact that Supreme Court keeps mentioning it in the list of things they consider? I think the reason it's mentioned is because Congress focuses on how seamen are exposed to perils in affording them these remedies, but that doesn't mean it's the test. And that's why PAPI, in my opinion, went as far as to state it's not, these people aren't exposed to perils, let alone they aren't members of the vessel. And Chandler's expressly states that exposure to perils of the sea is not coexistent with seaman status. Said another way, exposure to perils of the sea is not the end all be all because it's just an inherent part of doing this type of work. Just because you do this type of work and let's say you're working on a dock and a canal, granted, you're exposed to perils of the sea. That doesn't mean you're a Jones Act seaman. What about the shipyard cases that Mr. George mentioned? How do you deal with them? And I'm sorry, which shipyard case was that? Well, he mentioned a couple of shipyard cases where they said that the guy working in the shipyard was doing seamen's work. If he was referring to Gazzone, in Gazzone the court did not hold that a ship repair person was a Jones Act seaman because they were a ship repair person working in the harbor on a dock vessel. What Gazzone held is that the courts, when making determinations, cannot decide, okay, a ship repairman's in the Longshoremen's Act, therefore they cannot be a Jones Act seaman. You have to actually look at the facts of the case. Gazzone did not hold that ship repairman or per se Jones Act seaman. They just say you have to look at more than labels to make that determination. Gazzone remanded for trial. That's correct. And Gazzone remanded because there were fact issues regarding, there was a dispute regarding the amount of work he did and where he did that. We do not have that here. The facts are undisputed. And within two years after Gazzone, the Supreme Court decided Chandra's because the courts didn't know what to do with the totality idea. That is correct. Okay. So in conclusion, we would request that the Fifth Circuit modify its substantial connection to nature test and align that with Supreme Court precedent and find that Mr. Sanchez is not a Jones Act seaman as a matter of law. Thank you, Mr. Jett. Mr. George. Thank you. The test proposed by the amicus and smart fabricators involves that the ship needs to somehow be traveling or at least not jacked up. And I think that that is problematic for at least two reasons. One is in Chandra's, the Supreme Court rejected the so-called voyage test, the idea that if you're on a voyage, that would be meeting it. And if you're not, you don't. And specifically said that that's not that kind of approach is not the way to go. So in addition, I read his proposal to say that to be to have a substantial connection by virtue of nature, what negated Mr. Sanchez was he had no plans to sail with a vessel as it about its mission going from port to port. One, it was jacked up. It was he had no there was no plans, at least nothing put into evidence that he had any that he was destined to stay with a vessel and travel with the vessels. Well, smart fabricators proposed test does say that it should not count if the vessels jacked up. But I think that which is, I think, a huge problem here, because if Mr. Sanchez was to be doing the work of the ship when it was operating, this ship drill, this vessel drills for oil, and it does so when jacked up. So perhaps Mr. Sanchez had been flown out to a vessel that went to do some welding work while it was drilling that vessel is jacked up. And so under their test, even when it's doing the work that it's supposed to be doing, it could not count because of that. And which I think is is in no way any indication of the Supreme Court or Congress would have intended such a rule. Now, I think the final point I'd make is was asked about what what happens if the test were to be changed by the sport, if the sport were to alter or endeavor. And I think the appropriate thing would be to remand for us to present additional evidence, because there's no question that given the panel opinion, as Your Honor wrote it, we provided sufficient evidence to meet this court's semen test. And now if the court is going to change the test, then we should be allowed to present evidence to see if we can meet the new test. I think only that would be the just and fair approach. And here, for example, what what plans that he had was Mr. Sanchez on the vessel, getting it ready and then going to stay while it's working. And as I said, there's no evidence he would not stay. And as Mr. Jett pointed out, there's no evidence he would. Now, we did not need that evidence because we met that we met this court's test. Well, it's not up to him as to whether he would stay with that vessel. Right. Well, it could be a known fact. It could have been that he was told you're going there and you're going to stay and do all these things. And we just don't know that. Let me ask you a question, Mr. George. Isn't it correct that the Second Circuit has rejected Naquin? Yes. And the Ninth Circuit follows Naquin. So I think we have I don't know if they followed Naquin specifically, but they follow the approach of Naquin. And if we address in our in our brief. So I think but yes, there is some dispute and perhaps this maybe this case or one of these will maybe need to be considered again by the Supreme Court ultimately. But this court, I think we're looking at what is the premier maritime circuit? It is this court for as the amicus pointed out for, you know, since at least the 1940s on this court has led the way in interpreting what a seaman is. And in Naquin and Endeavor, this court made what we believe is the proper interpretation. And the idea that Popeye created an entire new test of going to sea and overrode Chandris is, we believe, incorrect. And instead, this court correctly ruled in Endeavor that that was it was just a restatement of the Chandris rule. And therefore, we would ask the court to abide by its rule, which is correct, follow Supreme Court precedent and reverse the district court's determination that it was a that he was not a seaman and remand to state court. If this court were to change the test, we would request that we be allowed to provide evidence to see if we can meet that test since the rules would be changing on us in the in the middle of game. You have any idea what evidence you would offer if there were a quote new test? Well, perhaps evidence regarding his plans of how long he was going to be on the vessel. If he was there to work on the vessel throughout the entire trip and the entire time it was drilling and operating. And the only thing that kept him from doing so was his injury. I think that would that would weigh in favor. I don't think, you know, just as people don't flit in and out of status, the idea that someone, I believe, the amicus that in support of us made the point, you know, if a person goes on a vessel ready to go on a trip around the world and the ship explodes before it leaves the dock, is that or, you know, but as it's pulling out, is that person not a seaman? And, you know, that we look at what they're the totality and as well as how tally where they what they would be doing. And so I think that at a minimum, you know, none of that is in the record because it didn't need to be in the record. Because as the panel unanimously agreed, we absolutely met the test as it stands. Thank you, Mr. George. Thank you. Thank you, counsel. That concludes today's arguments. The court will reconvene at nine o'clock in the morning.